653 So.2d 899 (1994)
The MISSISSIPPI BAR
v.
John W. (Jack) LAND.
No. 93-BA-00806.
Supreme Court of Mississippi.
December 21, 1994.
Rehearing Denied April 20, 1995.
*900 Charles J. Mikhail, Pascagoula, Michael B. Martz, Jackson, for appellant.
J. Niles McNeel, McNeel & Ballard, Louisville, Frank D. Montague, Jr., Montague Pittman & Varnado, Hattiesburg, for appellee.
Rebecca Lee Wiggs, Watkins & Eager, Jackson, for amicus curiae.
En Banc.
SMITH, Justice, for the Court:
The Mississippi Bar charged attorney John W. (Jack) Land with violations of Rules 3.3, 3.4, and 8.4 of the Professional Rules of Conduct. The genesis of the charges was a civil action wherein Billy Ray Stevens, while driving past the home of Jim Guthrie in Petal, Mississippi was injured in his left eye by a foreign object that flew through the open window of his automobile. A lawn mower was supposedly being operated at that time. The plaintiff Stevens' case centered on a rock allegedly thrown from the lawn mower. Subsequent interviews by the Guthries' insurance representative, Rachel Cole of State Farm Insurance, revealed that the Guthries' son, David, age 11, and a friend both mowed the lawn before noon and shot a BB gun across the road later that same day.
Attorney Michael B. McMahan, representing Stevens, wrote Guthrie a letter requesting information about Guthrie's lawn mower in order to possibly file a suit against the lawn mower manufacturer. The ultimate suit filed by Stevens was against Guthrie for negligent operation of the lawn mower. Attorney Land was aware of the BB gun incident and accompanying photograph as investigated and determined to have occurred by Rachel Cole of State Farm. Land noted in his file that the gun did not relate to the civil action and further reminded himself that information concerning the gun was not to be produced via discovery for the plaintiff Stevens. Although Land filed for a protective order regarding production of some of the evidence, he proceeded to file responses to the plaintiff's interrogatories without seeking a determination by the court or protective order concerning the interrogatories in question.
Land's runner mistakenly left Land's file with McMahan, and McMahan went through it discovering the BB gun information and photo therein. Stephen's civil suit was amended to include Land and State Farm as defendants and alleged negligent use of the BB gun and tortious interference with the suit by concealing evidence and giving false discovery responses.
The primary conduct cited by the Bar against Land included making false statements of fact, failing to disclose material facts and generally dishonest conduct. Land denied all allegations of misconduct in his answer to the formal complaint. The Complaint Tribunal unanimously dismissed the Bar Complaint finding no misconduct by Land. Convinced that Land's conduct was violative of the professional conduct rules and warranted discipline, the Bar appealed to this Court and framed the issues for review as follows:
I. IS THE EVIDENCE CLEAR AND CONVINCING THAT JOHN W. (JACK) LAND VIOLATED THE RULES OF PROFESSIONAL CONDUCT IN QUESTION? (Rule 3.3(a)(1) & (a)(2), Rule 3.4(a), and Rule 8.4(c & d)).
II. IF SO, WHAT DISCIPLINE WOULD BE APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE AND APPLICABLE LAW?
Although review of the evidence by this Court is de novo, deference may be given to the findings of the Complaint Tribunal due to its exclusive opportunity to observe the demeanor and attitude of the witnesses, *901 including the attorney, which is vital in weighing the evidence. Broome v. Mississippi Bar, 603 So.3d 349, 353 (Miss. 1992); Mississippi State Bar v. Strickland, 492 So.2d 567, 571 (Miss. 1986); Levi v. Mississippi State Bar, 436 So.2d 781, 782 (Miss. 1983).
However, we find that the tribunal incorrectly characterized this matter as a discovery dispute in its early stages, not warranting discipline against Land. The tribunal misapprehended the Rules of Professional Conduct in failing to note that Land's responding to certain interrogatories without revealing the BB gun incident constituted misconduct. Land clearly knew of its existence and relevancy as to causation of the injury in Stevens' lawsuit. This conduct certainly amounted to conduct involving dishonesty, deceit, misrepresentation, obstructing another party's access to evidence, conduct prejudicial to the administration of justice, and both failure to disclose a material fact and making a false statement of material fact to a tribunal.
The burden is on the Bar to show by clear and convincing evidence that an attorney's actions constitute professional misconduct. Attorney W.L. v. Mississippi Bar, 621 So.2d 235, 237 (Miss. 1993); Attorney Q. v. Mississippi State Bar, 587 So.2d 228, 232 (Miss. 1991). The Bar met its burden against Land. We find that Land's actions and conduct constitute professional misconduct. We must reverse the tribunal as to its finding of no misconduct by Land.

STATEMENT OF THE FACTS

BACKGROUND EVENTS
On May 26, 1990, Billy Ray Stevens was driving through a residential area in Petal, Mississippi and drove past the home of Jim Guthrie. Stevens, in a deposition stated: "Whenever I went through there I heard a lawn mower and I looked over and I looked back ahead of me and then something hit me." Stevens testified he suffered an injury to his left eye. The report of Stevens' doctor supported that Stevens suffered "significant loss of vision" and that his chance for recovery of sight was "very minimal." Subsequent interviews by the Guthries' insurance representative, Rachel Cole, revealed the Guthries' son, David, age 11, and a friend both mowed the lawn and shot a BB gun across the road that same day; at one point they heard a car slow down. Later a man came to the Guthries' home and reported that someone had been shot in the eye. A chronology of relevant events, taken largely from Rachel Cole's investigation of this claim, appears as follows:
May 26, 1990  Hospital records indicate Billy Ray Stevens seen at the emergency room of Forrest General Hospital at approximately 1315 hours, or 1:15 p.m., following an incident in which he suffered an eye injury. Report indicates Stevens suffered significant loss of vision with minimal chance of recovery in his left eye.
March 12, 1991  R. Cole interviews Jim Guthrie's wife, Sherrye, and son, David, concerning the events leading to the claim of injury by Billy Ray Stevens.
May 26, 1990  According to Sherry Guthrie, she remained inside the Guthrie's residence while her son, David, went outside to mow the lawn. David began mowing and was joined by his neighbor/friend, Ashley McAlexander. Sherry Guthrie stated the boys mowed the yard "before lunch up until about 12 o'clock." The boys then came into the house, ate lunch, and then rested. They later went back outside to play. Later Sherrye discovered from Ashley McAlexander's father that the boys had been shooting a bb gun while they were playing. When questioned, David admitted to his mother it was possible they had shot a man with the bb gun.
David Guthrie, recalled that he, then age 11, and Ashley McAlexander mowed the lawn on May 26, 1990. Afterwards, the boys "got tired" and "went inside to get some water." They next went back outside to play at their clubhouse, found the bb gun and began shooting "across the road." David stated the boys at one point heard a car slow down, got scared, and hid both themselves and the gun. They went back inside and later a man in a white truck came to the Guthries' door and reported *902 that earlier that day someone had been shot in the eye nearby.
By letter dated July 17, 1990, Attorney Michael B. McMahan, representing Stevens, the plaintiff, wrote a letter to the defendant, Jim Guthrie, requesting information about Guthrie's lawn mower in order to investigate the possibility of a suit against the lawn mower manufacturer. McMahan also wrote to Guthrie's insurance company, State Farm, requesting an interview with Guthrie. McMahan informed State Farm he would like to just "lay everything out on the table," and to "freely exchange facts." Ultimately suit was filed against Guthrie on behalf of Stevens for $25,000 alleging negligent operation of the lawn mower, resulting in serious injury to Stevens' eye. On March 8, 1991, Attorney Jack Land informed McMahan that he had been employed to defend Guthrie in this cause.
Correspondence between the two attorneys, McMahan and Land, concerning the case continued, with depositions scheduled and with McMahan continuing to request information about the lawn mower. The deposition of the plaintiff, Stevens, was taken by Land on April 3, 1991. In the deposition the only theory discussed of what hit Mr. Stevens in the eye was Mr. Stevens' belief that a rock had hit him as he drove past the Guthrie residence. Stevens recalled a lawn mower being operated in the Guthrie's yard at that time.
Stevens' attorney filed a motion for protective order on April 18, 1991, to have the depositions of additional plaintiff's witnesses postponed until depositions of defendant Guthrie and his son could be taken. The next day, Land filed a motion for protective order on behalf of Guthrie to preclude plaintiff from taking the deposition of or obtaining the claim file from Guthrie's insurance representative, Rachel Cole. Land asserted this file contained privileged information, not discoverable.

THE CONDUCT
Answers to plaintiff's interrogatories and responses to his requests for production were submitted by Land on behalf of Guthrie on April 15, 1991. Land stated Guthrie first submitted his answers to this discovery to Land, who typed and returned them, and instructed Guthrie to "call him immediately if any incorrect or inadequate replies existed." The following information was included therein:
REQUEST NO. 4: A copy of any statements taken, concerning the accident, by you or anyone acting on your behalf.
RESPONSE: Defendant objects on the ground that any statements taken are work product, trial preparation and contains mental impressions and conclusions of Defendant's insurer and indemnifier ... . .
REQUEST NO. 5: A copy of any investigative report made by you or anyone acting on your behalf.
RESPONSE: Defendant objects on the same ground as to Request No. 4 above.
REQUEST NO. 6: A copy of any photograph or motion picture, made by you or anyone acting on your behalf, which in any manner relates to this lawsuit, including a photograph taken of the subject lawn mower as it appeared on May 26, 1990.
RESPONSE: Will produce.
In Answers to Interrogatories, the following responses by Guthrie appeared:
INTERROGATORY NO. 2: Please identify the name and address of each and every person known to you to have been involved in or observed any part of the accident in question.
ANSWER: I have no knowledge of anyone involved in or having observed any such accident. The lawn mower was in operation on the date of the alleged accident by David Nelson Guthrie and he was assisted by neighbor's son, Ashley McAlexander, under the supervision of my wife, Sherrye Guthrie, at my direction. Excepting that I had not sanctioned Ashley's presents [sic] or use of my lawn mower.
INTERROGATORY NO. 3: Please identify all persons, whether you or anyone acting on your behalf, who obtained statements from or interviewed anyone during the course of investigating this case and for each statement, please state when, *903 where, and to whom the statement was made and what was said.
ANSWER: State Farm Representative, Rachel Cole, and attorneys.
INTERROGATORY NO. 6: Please state the name, age, and address of the person operating the lawn mower at the time of the accident.
ANSWER: [Same response as No. 2].
INTERROGATORY NO. 11: Please state whether or not the results of the investigation, if any, were reduced to writing. If so, please furnish the name, address and employment of the person or persons having possession of such report.
ANSWER: I have no personal knowledge of any written reports.
INTERROGATORY NO. 12: Please describe the conclusions, if any, reached by you or anyone acting on your behalf, as a result of your investigation as to the cause of the accident.
ANSWER: I have no information that convinces me that the alleged accident occurred.
INTERROGATORY NO. 13: Please state whether you or anyone acting on your behalf made any photographs or motion pictures and, if so, please state when such photographs or motion pictures were taken and describe what each purports to depict.
ANSWER: Rachel Cole inspected the lawn mower in the Fall of 1990 and took a picture of it.

THE COMPLAINT
The Bar cites the answers to interrogatories set forth above, as well as the following facts, as the basis for the Formal Complaint against Land:
On March 9, 1991, Land made a marginal notation in his file on the case beside two photographs of a BB gun taken by State Farm's representative, regarding the relevancy of the two photographs. The notation read: "Gun does not relate to civil action as worded in Complaint! Do not produce." Discovery responses were not then due until April 8, 1991.
On April 15, 1991, Defendant Guthrie answered Plaintiff Stephens' Interrogatories. The Answers to Interrogatories by Defendant Guthrie were not made until after Plaintiff Stephens' sworn deposition of April 3 that his injury was from a rock from a lawn mower.
In response to Interrogatory No. 11, ... Defendant Guthrie responded he had no "personal knowledge of any written report" when, in fact, Land knew a written report was made by Cole and furnished to Land.
Interrogatory No. 12 asked for "the conclusions, if any, reached by [Defendant Guthrie] or anyone acting on [his] behalf, as a result of [his] investigation as to the cause of the accident." Defendant Guthrie responded he had no information that convinces [him] that the alleged incident occurred," when, in fact, Defendant Guthrie and Land knew of statements given to State Farm's representative by Sherrye Guthrie and David Guthrie, wife and son of Defendant Guthrie, describing a shooting incident at a white vehicle.
[In response to Interrogatory No. 13] Defendant Guthrie responded that "Cole inspected the lawn mower in the fall of 1990 and took a picture of it," without mentioning in his response the photographs of the BB gun which were also taken by Cole and transmitted to Land.
After Land's file [on this case] was mistakenly left with McMahan on April 19, McMahan went through it and associated the Honorable William L. Denton ("Denton"), of Biloxi, Mississippi, who also read through it and filed a Motion to Amend Complaint, .. to add Land and State Farm as defendants. Denton filed the Motion to Amend Complaint attaching to it a proposed Amended Complaint alleging negligent use of the BB gun, tortious interference with cause of action by allegedly concealing evidence and giving false discovery responses, and asking for $50,000 in actual damages and $10,000,000 in punitive damages.
The Bar contends Attorney Land, through his handling of this case, and discovery in particular, violated the following Rules of Professional Conduct:

*904 Rule 3.3(a)(1) (making a false statement of material fact or law to a tribunal); Rule 3.3(a)(2) (failing to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client); Rule 3.4(a) (unlawfully obstructing another party's access to evidence or unlawfully altering, destroying or concealing a document or other material having potential evidentiary value, or counseling or assisting another person to do such act); and Rule 8.4 (c & d) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, and engaging in conduct prejudicial to the administration of justice).

THE TRIBUNAL
This Court appointed a Complaint Tribunal in this cause against Land on July 7, 1992. Following Land's answer to the complaint and discovery, a hearing before the Tribunal was held January 8 and June 4, 1993, in Jackson, Hinds County, Mississippi. Thereafter, the Tribunal unanimously dismissed the formal complaint against Land, finding he had not violated the Rules of Professional Conduct. The Bar appealed the Judgment of Dismissal to this Court.

DISCUSSION
I. IS THE EVIDENCE CLEAR AND CONVINCING THAT JOHN W. (JACK) LAND VIOLATED THE RULES OF PROFESSIONAL CONDUCT IN QUESTION? (Rule 3.3(a)(1) & (a)(2), Rule 3.4(a) and Rule 8.4(c & d)).
II. IF SO, WHAT DISCIPLINE WOULD BE APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE AND APPLICABLE LAW?
The Bar, after thoroughly setting out the facts detailed above, devotes four pages of its brief to answering the "threshold question" of "what is this case all about?" Stated simply, it is the Bar's position that Attorney Land clearly violated the Rules of Professional Conduct by purposely withholding during discovery, information in his possession that identified another theory of liability which the plaintiff could potentially have pursued against his client.
The positions of both the Bar and Attorney Land are perhaps most clearly and succinctly set forth in closing arguments before the Tribunal:
FOR THE BAR: What is the case all about? Mr. Land, acting as defense counsel for the Guthries and State Farm, had evidence that at or very near the time when Plaintiff Stephens drove by the Guthries' house in a white vehicle and was injured in the eye and partially blinded by a flying object, that the Guthries' son, David, was shooting a BB gun toward and over the road; that he shot at a white vehicle which slowed down and then left the scene; and that a relative of Stephens came by the house saying that [Stephens] ... was injured in the eye by a flying object as he drove by the house.
In deposing the plaintiff on April the 3rd, 1991, Mr. Land learned that neither the plaintiff nor his attorney, Mike McMahan, had any information about the BB gun and about the boy shooting the BB gun. And though Mr. Land testified ... that plaintiff was convincing at the deposition about a rock from a lawn mower injury, his true and candid assessment of the situation is contained in his own writing, in his own letter of April the 8th, 1991, to Dannye Smith, the claims supervisor at State Farm. (See Exhibit 30). Though Mr. Land says, as a basis and a foundation and as a defense for his actions and his conduct, that Plaintiff Stephens seemed certain, seemed unequivocal about the cause of his injury, that is not what Mr. Land reported to Mr. Smith.
In the April 8th, 1991, letter, Mr. Land tells Mr. Smith that the plaintiff thinks he saw dust kick up. He says that the plaintiff knew that something hit him in the eye. He says that he doesn't have the object that hit him, that he doesn't know what hit him, and that Mr. McMahan is focusing entirely on the mower. In other words, the Bar submits that Mr. Land was telling Mr. Smith that "they don't know anything about the shooting."

*905 In addition to statements and remarks he made to Mr. McMahan on April 3rd, Mr. Land did not disclose and allowed his client, Mr. Guthrie, not to disclose anything about the gun and anything about the shooting and made misrepresentations and deceived plaintiff's counsel in responses to discovery further pointing Mr. McMahan's attention away from any shooting and towards the manufacturer of the lawn mower.
What's interesting, the Bar submits, is that the objections that Mr. Land put on the draft of the responses to discovery before deposing Mr. Stephens disappeared after he [Land] learned at the deposition that neither Mr. McMahan nor Stephens had any idea about the shooting.
* * * * * *
In the Court's opinion in the Mathis decision, which the Bar believes supports the position taken by the Bar in this case, the Supreme Court unequivocally stated that deceit on the part of an attorney is unethical and warrants sanction.
* * * * * *
The plaintiff's complaint in the civil action alleged on information and belief plaintiff was injured by a rock from a lawn mower. In his answer Mr. Land denied that plaintiff was injured by a rock from a lawn mower, thereby making what, in fact, caused plaintiff's injury an issue.
Issues are made, as the Tribunal well knows, by the pleadings. How the evidence of the BB gun and the shooting can be regarded, as Mr. Land maintained, not relevant is beyond comprehension.
Under the facts and circumstances known to the plaintiff and to his attorney, it would have been very difficult and some would argue impossible to have proved causation from a rock from a lawn mower. And Mr. Land, in turn, would have saved his valued client, State Farm, probably the limits of the policy, $100,000. On the other hand, plaintiff could have more easily established by a preponderance of the evidence causation from the BB gun had it been disclosed and had they been aware of it.
The Bar respectfully submits that the reason Mr. Land acted the way he did and concealed the evidence of the BB gun and the shooting was not because they were irrelevant, but because they were highly relevant. His conduct or, more appropriately, the Bar submits, misconduct as charged in the Formal Complaint warrants appropriate discipline by this Tribunal.
FOR ATTORNEY LAND (MR. McNEEL): Members of the Tribunal, I feel very strongly about this case... . [P]rimarily because I see that the Bar is continuing in a direction that I think is very dangerous; and that is looking over the shoulder of every attorney and how he answers discovery, not whether or not he is lying, but in the way that he words his responses; not in the context of the total discovery and the lawsuit, but in the context only of a particular response.
* * * * * *
The Bar has charged him with fraud. They charged him with deceit. They charged him with dishonesty. They charged him with misrepresentation. In a court of law that calls for clear and convincing evidence. What we have had from the beginning in this case, although the Bar, of course, staunchly disputes it, is a discovery dispute pure and simple.
* * * * * *
Another thing that Mr. Land did  and he has said it over and over, and the Bar has made little mention of it  is that he filed the motion for protective order. He objected to what they were trying to produce... . [T]hey were going before the court for the judge to determine what should be disclosed to whom.
That was Mr. Land's obligation to the other side. That's what the law says he's supposed to do. That's the only way that he can properly represent his client and yet do what the court says he's supposed to do as far as discovery when he may have things that are beyond the lawsuit.
But this is the type of case that should not be up before a Tribunal of the State Bar, where a man who has had character witnesses come up here and tell you in *906 glowing terms [what] they think about Jack as an attorney... . And now for the first time in his career, because of how he perceived his direct responsibility to represent his client, he is charged not just with unprofessional conduct, but with fraud, deceit, and dishonesty.
The Tribunal in unanimously finding Land did not violate the rules of professional conduct, as charged, concluded the proceedings by commenting:
Now, further, for the record, unanimously it's being stated by this Tribunal that this Tribunal also is concerned with the direction that the Bar is taking regarding these complaints, because this Bar  this Tribunal completely disagrees with this cause of action.
At first glance, it might appear that Land's attorney was correct in characterizing this case as essentially a discovery dispute. Land submits in support of his actions that the information about the BB gun was not discoverable, being both irrelevant and privileged. Our attention is turned to the Mississippi Rules of Civil Procedure.
Mississippi Rules of Civil Procedure, Rule 26 concerning discovery in general provides, in relevant part:
(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party.

Land contends the comment to (b)(1) further supports his position:
Sweeping and abusive discovery is encouraged by permitting discovery confined only by the "subject matter" of a case  [the language of former Miss. Code Ann. § 13-1-226(b) (1972)] rather than limiting it to the issues presented. Discovery should be limited to the specific practices or acts that are in issue. Determining when discovery spills beyond "issues" and into "subject matter" will not always be easy, but MRCP 26(b)(1) is intended to favor limitations, rather than expansions, on permissible discovery.
The record indicates the civil complaint in the matter of Stephens v. Guthrie was filed on February 21, 1991. The complaint specifically averred:
"That on or about May 26, 1990, and on information and belief, the Defendant's agent, servant or employee, negligently operated a lawn mower to throw a rock into the Plaintiffs vehicle, striking the Plaintiff in the eye and causing him severe injury."
"That as a result of the negligence of the Defendant as foresaid, the Plaintiff suffered serious injury to his eye... ."
The complaint set forth no alternative theory of causation. On March 12, 1991, Land received a letter from plaintiff's counsel concerning the lawn mower and requesting the deposition of the person operating it on the date of the accident. The plaintiff's deposition was taken on April 3, and answers to plaintiff's interrogatories filed by Land on behalf of his client on April 18, 1991. The responses filed by Land constitute the primary basis for this Court's finding of unprofessional conduct by Land.
The Bar cites the case of Mississippi Bar v. Mathis, 620 So.2d 1213 (Miss. 1993), a case with striking similarities to the case sub judice. Therein the attorney failed to disclose to the court and opposing counsel that an autopsy had been performed and through answers to discovery gave the distinct impression none had been. Id. at 1219. This Court found Mathis' "knowing misrepresentations" were prejudicial to the administration of justice and involved dishonesty, fraud and deceit. Id. at 1220. The Court ultimately lengthened the 180 days suspension imposed by the Complaint Tribunal to one (1) year. The Court determined Mathis' conduct was one of those situations contemplated in the comment to Rule 3.3(a)(1) in which the "failure to make a disclosure is the equivalent of an affirmative misrepresentation." Id. In fact, in Mathis' case, he assisted his client into being a party to a fraud on the court, rather than vice versa.
The Mathis Court made on observation which seems particularly relevant herein:

*907 Although Mathis argued that he was not required to disclose any of this information because of attorney-client privilege and because the autopsy was his work product, these arguments are without merit. Even if such privileges were believed applicable by Mathis, it was not for him to determine that the privilege applied. The proper procedure would have been for him to object to the interrogatories and deposition question and affirmatively assert the privilege, leaving the matter to be decided by the court.

Id. at 1221. (emphasis added).
It would appear Land did take some of the necessary steps in his representation of Guthrie, thereby leaving the decision on some aspects of discovery to the trial court. However, Land's proceeding to respond to interrogatories rather than also submitting the issues to be decided by the trial court defeats his argument regarding misconduct on this point as clearly identified by this Court in Mathis.
Interrogatory Number 6 asked who was operating the lawn mower. The response listed David Guthrie but stated that Jim Guthrie had no knowledge of anyone involved in or having observed any such incident. The answer was not only unresponsive, but also misleading in that it tended to give the impression that the lawn mower was in use at the time of the accident. In fact such was not true; operation of the lawn mower ceased around noon on that date. The hospital records confirm the time of Stevens' arrival at approximately 1:30 p.m., which time also agreed with the boys' indication of when the BB gun incident occurred.
Interrogatory Number 10 asked who had conducted any investigation. The response named Rachel Cole of State Farm.
Interrogatory Number 11 asked if such investigation and results thereof had been reduced to writing. Land allowed Guthrie to respond that he had no "personal knowledge of any written report" when, contrary to such response, Land knew and had a copy in his file of the report of Rachel Cole and the pictures of the lawn mower and BB gun.
Interrogatory Number 12 asked for "the conclusions," if any, reached by Guthrie or anyone acting on his behalf, as a result of his investigation as to the cause of the accident. The response indicated that he had "no information that convinces him that the alleged incident occurred." In truth and in fact, Land knew that statements given to Rachel Cole by Sherrye Guthrie, wife of Jim Guthrie, and David Guthrie, their son, described the shooting of the BB gun across the road, the white car driving slowly by and someone coming by their home shortly thereafter stating that a man had been struck in the eye by an object. However, the only conclusion to be drawn from this interrogatory response was that Land and Guthrie had no idea or evidence regarding how Stephen's eye was severely injured.
Equally disturbing about this response is the fact that in Cole's report, given to Land by Jim Guthrie, along with additional information provided by Guthrie, was the admission by David Guthrie that he and his friend, Ashley McAlexander, were shooting a BB gun at a target toward and over the road on the day of the incident about the time that Stephens was injured as he drove by the Guthrie's property. Land, as attorney for Guthrie and State Farm, admitted that the two boys had quit mowing the lawn around noon, ate lunch and watched a VCR tape, and then began shooting the BB gun shortly before 1:00 p.m. on the day of the incident. On March 12, 1991, Jim Guthrie testified at his deposition that his son told him that he, David, thought he might have shot somebody and that he wished he could tell the guy he was sorry; that Jim Guthrie and David drove by Stephens' house and David admitted that Stephens' vehicle looked like the one that went by as the boys shot the gun; and that David said nothing unusual about the lawn mower and they did not even consider it a possibility of being the cause of the injury. Jim Guthrie also stated that it came as a shock to him when Plaintiff Stephens made the lawnmower claim since their concern was always the BB gun shooting. Guthrie stated that he related to State Farm and Land what his son had told him. This information would have clearly eliminated the theory of *908 the lawn mower throwing a rock as the cause of the eye injury.
Interrogatory Number 13 asked for photographs or motion pictures that were taken and what each purports to depict. The response admitted the existence of the lawn mower photograph, but fails to mention the photograph of the BB gun, a photo also taken by Cole. By failing to disclose the photograph of the BB gun, to object to disclosure on the grounds that the request was overly broad, or to claim a work product privilege and move the court to cover these interrogatories by protective order, Land instead concealed the very existence of the BB gun incident, and evidence of what may have actually caused the injury to Stephens. The distinct impression conveyed by this response was that no other photographs existed, a complete untruth.
Stephen's attorney, Michael B. McMahan, testified that at the deposition he inquired of Land if the photographs Land showed him of the lawn mower were "everything," and that Land responded that the photos were everything, without mentioning or showing him photos of the BB gun. Land also told McMahan that the "guards" on the lawn mower were not removed, thereby reminding McMahan he ought to keep his word and dismiss the lawsuit against Guthrie. Land in effect encouraged suit against the lawn mower manufacturer. These statements were calculated to deceive McMahan and divert his attention away from any potential negligence of Guthrie due to the BB gun incident, for which Guthrie himself felt he had the greatest exposure. Under the facts as presented in this record, it is clear that Stephens' chances of proving causation of the injury to his eye by the lawn mower were extremely slim at best. Yet, these same facts could have more easily established causation from the BB gun incident, had it been disclosed by Land.
Equally problematic is Land's response to Request for Production Number 6 regarding photographs "which in any manner relate to this lawsuit." Land's file notation indicated, "Gun does not relate to civil action as worded in Complaint! Do not produce." Land responded that he would produce all photographs, yet in view of the notation from his personal file, Land never intended to produce the BB gun photo. On April 8, 1991, Land wrote a letter to Dannye Smith, State Farm's claims supervisor, in which Land stated that Stephens only thinks he saw dust kick up, that "something" hit him in the eye, that he does not have the object that hit him, that he does not know what hit him, and that Stephens' attorney is focusing entirely on the lawn mower, and that Stephens will likely dismiss the suit and go after the lawn mower manufacturer. This letter by Land to State Farm clearly contradicts Land's testimony before the Tribunal. Land testified that after Stephens' deposition testimony he was convinced Stephens' injury was the result of a lawn mower throwing a rock. What is clear from all of the information possessed by Land is that the possibility of the lawn mower being the causation of Stephens' injury was not a valid allegation. As Land's client Jim Guthrie had stated, their concern was always the BB gun incident.
The Bar contends that if a runner for Land had not mistakenly delivered Land's file on this case to his opposing counsel, McMahan, the information on the BB gun would never have been disclosed, no matter how any interrogatories were phrased. A reading of this record indicates that the Bar is most likely correct in this argument. Cole's report and the photograph and other evidence in Land's possession was relevant and material to the issue of causation of Stephen's eye injury. Land concealed these material facts and documents of potential evidentiary value.
On April 18, 1991, plaintiff's counsel filed a Motion for Protective Order seeking to postpone the taking of additional depositions until his Motion to Compel was ruled on by the court. The motion for protective order specifically stated plaintiff was seeking "copies of statements of the insured [Guthrie] and other potential eyewitnesses which were taken by State Farm Insurance adjuster Rachel L. Cole during an investigation of this claim."
In answer to plaintiff's motion for protective order, Land stated his position that the attempt to obtain the insurance representative's report, including interviews with Guthrie, *909 his son and other witnesses, was not discoverable as it contained work-product material and because plaintiff did not attempt to take his own depositions of these witnesses rather than attempting to rely on the insurance company's investigation into the incident.
Thereafter, Land filed his own Motion for Protective Order seeking to prohibit the taking of Rachel Cole's deposition and access to her claim file. The fact that Land did not initiate his request for a protective order prior to such a request by McMahan is significant in this case indeed. Even more significant is that Land filed his responses to certain interrogatories without seeking the same protective order of the court, which was just as applicable at that time as it was at the later time when he subsequently requested such action. This conduct of Land's forms the very basis of the Bar's case against him. Land believed the information which Rachel Cole had obtained, including interviews and photographs concerning the BB gun, was privileged as work product material and involving matters subject to the attorney/client privilege. Land's action in responding to the interrogatories, clearly withholding relevant material information, and giving misleading, deceptive and outright false responses without seeking the same protective order of the court, effectively eliminated any credibility for Land to maintain that position. Had Land not proceeded in responding to the interrogatories, but rather allowed the lower court to first consider interrogatory responses and all other issues regarding discovery as to whether the report of Rachel Cole was subject to being discovered by McMahan or not, this case might indeed be, as Land maintained, nothing but a discovery dispute and a premature filing of alleged misconduct by the Bar.
Finally, Land is charged with a violation of Rule 8.4 (c & d) for conduct involving "dishonesty, fraud, deceit or misrepresentation" and conduct "prejudicial to the administration of justice." To be guilty of such violations, this Court would have to find that Land had a duty to disclose the information about the BB gun and that he purposely failed to disclose or misrepresented this information, thus obstructing the administration of justice in this matter. We find that Land's conduct did amount to professional misconduct and violations of Rules 3.3, 3.4 and 8.4 of the Professional Rules of Conduct as the Bar contends.
The Bar suggests "a lengthy suspension" to be appropriate due to the misconduct of Land. Factors generally considered by this Court include: (1) nature of the misconduct, (2) the need to deter similar misconduct, (3) preservation of the dignity and reputation of the profession, (4) protection of the public, and (5) sanctions imposed in similar cases. Steighner v. Mississippi State Bar, 548 So.2d 1294, 1297-98 (Miss. 1989). However, punishment for any violation is considered and imposed on a case-by-case basis and is not governed by a set standard. Clark v. Mississippi State Bar Association, 471 So.2d 352 (Miss. 1985); Brumfield v. Mississippi State Bar Association, 497 So.2d 800 (Miss. 1987); Mississippi State Bar v. Young, 509 So.2d 210 (Miss. 1987).

CONCLUSION
The majority of emphasis in the case sub judice has been placed upon whether or not Land's actions constituted misconduct. Having determined Land violated the Mississippi Rules of Professional Conduct, as charged, it is left to this Court to determine the appropriate sanctions. "This Court has exclusive jurisdiction over an attorney and his/her license to practice law in this state." Mississippi State Bar v. Nichols, 562 So.2d 1285, 1287 (Miss. 1990); Mississippi State Bar v. Nixon, 494 So.2d 1388, 1389 (Miss. 1986). For all intents and purposes, the Court is of the opinion that what we are here faced with is another Mathis case, pure and simple. Land's conduct clearly included the deliberate concealment of evidence intended to deceive opposing counsel and client from pursuing their claim, as well as the court in learning all the facts of this case. Such conduct is certainly prejudicial to the administration of justice.
This Court in recent times has been overwhelmed with cases involving allegations of abuses of discovery, and, initially, it appeared *910 this might be another. However, our thorough examination of this matter leads us to the inescapable conclusion that Land's handling of this case went far beyond what could be considered a discovery dispute. Land knowingly concealed potentially significant facts and evidence in his possession. Deceit of such magnitude demonstrates a clear and convincing violation of the rules of professional conduct. We are in agreement that appropriately sanctioning Land for his clear misconduct in this matter will thereby maintain the integrity of our adversary process and that to conclude otherwise would be to give this Court's seal of approval to a system which places technical accuracy above that which should be the common goal of all its participants  to learn "the truth, the whole truth and nothing but the truth."
We are guided in determining an appropriate sanction by the ABA Standards for Imposing Lawyer Sanctions, (1986), and the following recommendation:
§ 6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
As we held in Mathis, we determine a one (1) year suspension of Land from the practice of law to be an appropriate sanction for his violations of the rules of conduct.
REVERSED AND RENDERED; JOHN W. (JACK) LAND IS HEREBY SUSPENDED FROM THE PRACTICE OF LAW FOR A PERIOD OF ONE (1) YEAR.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS McRAE, and JAMES L. ROBERTS, Jr., JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
In the case sub judice, the Mississippi Bar asks this Court to establish a dangerous precedent  one that allows attorneys to use the Mississippi Rules of Professional Conduct (hereinafter MRPC) as a weapon by which one attorney may coerce or blackmail his opponent into a settlement. The Mississippi Bar's position rewards those that draft broad, vague and sweeping discovery requests and punishes the attorney who interprets those broad discovery requests narrowly. Likewise, the Mississippi Bar's position clearly ignores the duty of confidentiality that an attorney owes his client. Therefore, I respectfully dissent.

STANDARD OF REVIEW
In considering appeals from the Complaint Tribunal, we employ a de novo standard of review because this Court has exclusive and inherent jurisdiction of matters pertaining to attorney discipline. Hall v. Mississippi Bar, 631 So.2d 120, 122 (Miss. 1993). However, this Court is not prohibited from giving deference to the findings of the Tribunal. Mississippi State Bar v. Odom, 566 So.2d 712, 714 (Miss. 1990). While this Court reviews decisions of the Complaint Tribunal de novo, I would respectfully suggest that the Complaint Tribunal, after hearing the testimony and being apprised of the law, reached the correct decision and therefore, I would affirm the Complaint Tribunal's findings and dismissal of the complaint.

I.
The Mississippi Bar cites Land's discovery responses as its primary basis for seeking Land's suspension. The Mississippi Bar argues that Land's responses to the interrogatories propounded by the plaintiff to the Guthries violated MRPC 3.3(a)(1); 3.3(a)(2); 3.4(a); and 8.4(c) & (d).
Since the Mississippi Bar alleges that this action has its genesis in Land's representation of Guthrie during the discovery stage of Stephens v. Guthrie, we should first determine if Land violated our rules of discovery. Miss.R.Civ.P. 26(b)(1) provides:
Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

*911 Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party. The discovery may include the existence, description, nature, custody, condition and location of any books, documents, or other tangible things; and the identity and location of persons (i) having knowledge of any discoverable matter or (ii) who may be called as witnesses at the trial. It is not ground for objection that the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (emphasis added).
For further edification, we must look to the comments following Miss.R.Civ.P. 26. The comments to Miss.R.Civ.P. 26(b)(1) emphatically state that "[d]iscovery should be limited to the specific practices or acts that are in issue. Determining when discovery spills beyond `issues' and into `subject matter' will not always be easy, but MRCP 26(b)(1) is intended to favor limitations, rather than expansions, on permissible discovery." (emphasis added).
Make no mistake about it, the specific act at issue in the underlying suit, Stephens v. Guthrie, was whether Guthrie operated his lawn mower in a negligent manner so as to cause Stephens' injury. Thus, the interrogatories propounded to Guthrie were calculated to discover what Guthrie knew about the alleged lawn mower accident and not whether Guthrie knew of any other explanations for the plaintiff's injury, plausible or not. The responses given by Guthrie were specifically addressed to the plaintiff's allegation that he was injured by Guthrie's negligent operation of a lawn mower. Guthrie was not asked to provide the plaintiff with any additional hypotheses as to how the plaintiff's injury occurred nor did he volunteer any such hypothesis.
Today, the Mississippi Bar seeks to require a lawyer, who is defending his client to the best of his ability, to disclose all of his client's confidences during the course of discovery. While the federal courts may now require such sweeping disclosure, heretofore, this Court has not required attorneys practicing in state courts to provide such sweeping disclosure. Surely, if we are going to require the same type of disclosure as is now employed by the federal courts, the lawyers of this State are owed some advance notice; and that includes Land.
Of equal import in this case are the responses that were given by Guthrie to the plaintiff's interrogatories. In interrogatory number 2 Guthrie was asked to name any person known to have been involved in or who observed any part of the accident in question. Guthrie answered that he did not have any knowledge of anyone involved in or having observed any such [lawn mower] accident. However, Guthrie informed the plaintiff that his son, David Guthrie, and his son's friend, Ashley McAlexander, were operating the lawn mower on the date of the alleged accident.
In interrogatory number 3, Guthrie was asked to identify all persons who obtained statements from or interviewed anyone during the course of the accident investigation. Guthrie informed the plaintiff that State Farm Agent Rachel Cole and attorneys had conducted interviews and obtained statements from them.
Obviously, as a result of these answers the plaintiff's attorney, through the use of oral depositions could have explored whether Guthrie, his wife and son, and the son's friend, Ashley McAlexander, had knowledge of any other possible causes of his injury. Likewise, the Guthries disclosed the name of the State Farm Agent that conducted the investigation into the plaintiff's injury. The plaintiff could have sought information from her through the use of depositions to determine if she had knowledge of any other possible cause of his injury. Accordingly, it is submitted that Guthrie's answers to the interrogatories were such that the plaintiff, had he chosen to exercise some amount of diligence, could have discovered information that would have led him to other potential theories of causation.

II.
The Mississippi Bar argues that this Court's opinion in Mississippi Bar v. Mathis, 620 So.2d 1213 (Miss. 1993), is dispositive to the case sub judice. However, it is my opinion *912 that the Mississippi Bar's reliance upon Mathis is misplaced. In Mathis, this Court suspended the Appellee from the practice of law for one year because he lied to the court and he lied to opposing counsel during the course of discovery. In the case sub judice, the Appellee did not lie to counsel opposite nor did he lie to the court and thus, Mathis is not applicable to the case at bar.
In Mathis, the "specific practices or acts that [were] in issue," was whether several insurance companies could have J.R. Laughlin, Sr.'s body exhumed so that they could have an autopsy performed to determine Laughlin's cause of death. While contesting the insurance companies' attempts to have the body exhumed, the attorney for the Laughlin family gave misleading answers to specific interrogatories asked by opposing counsel. When asked by opposing counsel to name all parties who had first-hand knowledge of the facts and circumstances of the death, Mathis intentionally omitted any reference to the pathologist that he and J.R. Laughlin, Jr. (the deceased's son) had obtained to conduct an autopsy on the deceased. Likewise, Mathis falsely represented to the federal district court that "[n]o autopsy has been performed, and the State Medical Examiner has no intention of petitioning the court for an Order permitting exhumation for autopsy." Id. at 1217. There were other instances where the Appellee was asked questions that called for specific answers and yet, he failed to respond to the questions as asked so as to hide the fact that he had had an autopsy performed on the deceased.
In the case at bar, Land advised Guthrie within our rules of discovery and discipline to answer questions that were vague, overly broad and poorly drafted. Furthermore, Guthrie answered the questions as they related to the specific act at issue, e.g., the alleged lawn mower accident. Likewise, Land, unlike Mathis, did not attempt to keep the plaintiff from learning the names of witnesses with information that could lead to different theories of causation of his injury. Accordingly, the Bar's reliance on Mississippi Bar v. Mathis, 620 So.2d 1213 (Miss. 1993), is incorrect and does not control the case sub judice.

III.
In closing, the Mississippi Bar would have us punish Land for not revealing his client's confidences. The Bar suggests that Land violated our rules of discipline based upon his client's responses to poorly worded, vague and sweeping interrogatories propounded by the plaintiff. I would suggest that Land did what all attorneys are taught in law school; that is, to protect his client's confidences within the framework of our rules of procedure and rules of ethics. Furthermore, Land did not violate our rules of discovery nor did he violate our rules of discipline. The responses given to the plaintiff's interrogatories were such that, given some diligence on the plaintiff's part, through depositions, he could have obtained admissible evidence which could have led to the discovery of the BB gun. Therefore, I find that the Mississippi Bar did not prove by clear and convincing evidence that Land violated the MRPC and thus, I find that the Mississippi Bar's complaint is without merit.
I respectfully dissent.